IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2017

**IN RE DEMARKUS T., ET AL.**

**Appeal from the Juvenile Court for Montgomery County
Nos. 2013-JV-1181, 2013-JV-1182      Kenneth R. Goble, Jr., Judge**

_____

**No. M2016-01839-COA-R3-PT**

_____

This appeal arises from the termination of Mother's and Father's parental rights with respect to their two minor children. The children were removed from the parents' custody by the Department of Children's Services ("DCS") in July 2013 after investigators responded to a call where the children's sibling was found deceased at home. DCS filed a petition to terminate the parental rights of Mother and Father on the grounds of severe abuse and best interests. The trial court found clear and convincing evidence of grounds supporting termination and that termination of their parental rights was in the best interests of the children. Mother and Father separately appealed. After review, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and BRANDON O. GIBSON, JJ., joined.

Robert Allan Thompson, Clarksville, Tennessee, for the appellant, Rawny A.[1]

Dailey Elaine Wilson, Clarksville, Tennessee, for the appellee, Demarkus T.

Herbert H. Slatery, III, Attorney General and Reporter; Martha A. Campbell Assistant Attorney General; and Brian Allan Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Sheri S. Phillips, Clarksville, Tennessee, for the minor children DeMarkus T. Jr. and MarKayla T.

_____

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

# OPINION

At issue in this case are the parental rights of Rawny A. ("Mother") and Demarkus T. ("Father") with regard to their minor children, MarKayla T., born March 2007, and DeMarkus T. Jr., born December 2009 (collectively, the "children"). The children also had a sister, Arianna T., born February 2009, who is now deceased. Mother and Father, now divorced, are separately pursuing their parental rights.

After suspected abuse in April 2009, Markayla and Arianna entered into the custody of the Department of Children's Services ("DCS"). Once in DCS custody, two-month old Arianna was discovered to have rib and skull fractures. MarKayla also suffered bruises and other injuries at that time. DeMarkus T. Jr.[2] joined his siblings in DCS custody after his birth in December 2009. Although DCS retained custody of all three children until June 2012, the juvenile court eventually returned the children to the parents' custody. At that time, the juvenile court made a finding that the children had been severely abused but did not directly attribute the abuse to the parents or to anyone else specifically.

In July 2013, investigators responded to a 911 call to Mother's and Father's home and found then four-year-old Arianna deceased. Mother and Father were arrested, and the other children were again taken into DCS custody. Shortly thereafter, DCS petitioned to terminate Mother's and Father's parental rights based on two grounds: severe child abuse, under Tenn. Code Ann. § 36-1-113(g)(4) and Tenn. Code Ann. § 37-1-102(b)(22),[3] and best interests of the children, under Tenn. Code Ann. § 36-1-113(i). At a preliminary hearing held shortly after the children entered DCS custody, a no-contact order was entered against Mother and Father. Neither Mother nor Father had any subsequent contact with the children other than at Arianna's funeral.

Mother and Father were tried criminally for Arianna's death in July 2015. Father was convicted of felony murder, aggravated child abuse, and false report and sentenced

---

[2] Because the minor child DeMarkus T. Jr. shares the same first name as his father, DeMarkus T., we will refer to the elder DeMarkus as "Father" and the son as "DeMarkus" throughout this opinion, for the sake of clarity.

[3] At the time DCS filed its petition, the definition of "severe child abuse" was found at Tenn. Code Ann. § 37-1-102(b)(23). The legislature updated the statute by the time of trial, and the definition of "severe child abuse" was codified at Tenn. Code Ann. § 37-1-102(b)(21). At the time of this appeal, the legislature has again updated this section of Tennessee law, and the definition of "severe child abuse" is now codified at Tenn. Code Ann. § 37-1-102(b)(22). Because there have been no substantive changes to the definition at any time material to this action, we will cite to the current version of this statutory definition throughout.

to life in prison. Mother was convicted of criminally negligent homicide, reckless endangerment, and false report and was sentenced to five years in prison.

Trial for the present issue concerning the termination of Mother's and Father's parental rights was held on May 26, 2016, by the Juvenile Court for Montgomery County. The court heard testimony from two DCS workers, Mother's sister, and Mother's mother. Mother testified on her own behalf. Father was incarcerated at the time of trial and did not testify.

Karmen Davis was the DCS investigator assigned to this case from July 2013 to January 2014. Ms. Davis testified at trial that the children resided in the home with Mother and Father at the time she received this case. Ms. Davis stated she took the children into the State's custody due to the nature of the allegations concerning the death of Arianna. Once in custody, Ms. Davis testified that DeMarkus told her that he was unable to sit down because his legs hurt. Ms. Davis inspected DeMarkus and found multiple bruises, which DeMarkus explained he had received from "a whipping." Further, Ms. Davis testified that she came off the case and transferred it Joi Mosley, the DCS family service worker assigned to this case July 2013 through April 2015.

Ms. Mosley testified at trial that the children remained in DCS custody continuously from July 2013 through the present. Ms. Mosley stated that MarKayla reported being beaten by her father and being scared to see her family because they had killed her sister. Although the children were initially reluctant to go out in public for fear of running across Mother and Father, Ms. Mosley testified that the children have thrived in foster care. She stated they have been in the same foster home since October 2013, have bonded with the family, and know the foster family as their parents, referring to the foster parents as "mom" and "dad." Ms. Mosley testified that the foster family intends to adopt the children if given the opportunity. Ms. Mosley further stated that both children have expressed to her, on multiple occasions, that they feel safe and want to be adopted.

Ms. Mosley's testimony also focused on the amount of contact Mother and Father have had with the children since being taken into DCS custody. Ms. Mosley testified that Father has not had any contact with the children since July 2013; however, Ms. Mosley acknowledged on cross-examination that Father has been incarcerated throughout the duration of this case and that he continues to be under a no-contact order by the court. Ms. Mosley stated that she visited Father when he first went to jail to see if Father would like to participate in any meetings, but Father said he did not want to participate. Ms. Mosley further testified that services were also offered to Mother "in the beginning," but that Mother refused to take advantage of these services. Ms. Mosley admitted on cross-examination that she was aware Mother requested to see the children after the no-contact order was put in place, but that Mother's request was denied. Ms. Mosley testified that during the one visit between the children and Mother, which took place during Arianna's funeral, the children were upset when they had to leave Mother. Ms. Mosley

acknowledged that it was impossible for Mother to maintain a relationship with the children once the case was brought against her, as there was a no-contact order. Ms. Mosley stated that she does not believe the children will ever be safe if they are returned to Mother's or Father's care.

Mother testified at trial that Father was physically, emotionally, and mentally abusive to her during the last four years she and Father were together. Mother admitted she was afraid of Father. However, according to Mother, she never saw Father mistreat the children and never believed the children might also be scared of Father. Although Mother acknowledged the court's finding that the children had suffered severe abuse in 2009, Mother reiterated that the children were returned to her and Father, and that neither parent was charged with child abuse at that time. Mother stated she did have notice at that point that somebody was abusing the children. Mother testified that she attempted to maintain a relationship with the children after they were taken into DCS custody, but the State did not offer her any type of parenting class or opportunity to be reunited with the children. If given the opportunity, Mother testified she would participate in these programs willingly. Mother stated that she wants a relationship with the children, that she was not aware of the abuse that was going on in the house, and that she would protect the children in the future.

Mother's sister and mother both testified on Mother's behalf at trial. They stated that Mother had a good relationship with her children, and that Mother loved and supported her children.

At the conclusion of proof, DCS made an oral motion, pursuant to Tenn. R. Civ. P. 15.02, to allow the pleadings to conform to the proof that was submitted at trial. DCS contended that the evidence presented of parents' criminal convictions constituted clear and convincing evidence of additional grounds for termination of parental rights under Tenn. Code Ann. § 36-1-113 (g)(5) because Mother and Father were sentenced to more than two (2) years' imprisonment for conduct against the children who were the subject of the petition. Tenn. Code Ann. §36-1-113(g)(5). The trial court granted this motion.

In a written order entered on August 15, 2016, the trial court terminated Mother's and Father's parental rights based on a finding of severe abuse committed by Mother and Father and Father's imprisonment of two or more years for conduct against the children.[4] The trial court also determined that termination of Mother's and Father's parental rights was in the children's best interests.

---

[4] The trial court did not find clear and convincing evidence that Mother's parental rights should be terminated based on her sentence of exactly two years. We discuss this in more detail later in the opinion.

- 4 -

Mother and Father separately appealed, raising the following issues:

1. Whether the trial court properly determined that grounds existed to terminate Mother's and Father's parental rights.
2. Whether the trial court properly determined that the termination of Mother's and Father's parental rights was in the best interests of the children.

**STANDARD OF REVIEW**

Parents have a fundamental right to the care, custody, and control of their children under both the United States and Tennessee Constitutions. *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002) (citing *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972)). This right is superior to the claims of other persons and the government, but it is not absolute; the state may terminate a person's parental rights under certain circumstances. *In re Heaven L.F.*, 311 S.W.3d 435, 438 (Tenn. Ct. App. 2010); *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982).

Under Tennessee law, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

**ANALYSIS**

I. GROUNDS FOR TERMINATION

In order to terminate the parental rights of a biological parent, a petitioner must first prove, by clear and convincing evidence, at least one of the listed grounds for

termination. *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); Tenn. Code Ann. § 36-1-113(g). Those grounds include severe abuse and imprisonment for more than two years. *See* Tenn. Code Ann. § 36-1-113(g)(4)–(5). In this case, the trial court concluded that each of these grounds was proven by clear and convincing evidence. We agree.

A. Mother and Father Committed Severe Abuse

Under Tennessee law, grounds for parental termination exist when:

[t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" includes, *inter alia*, "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(22)(A)(i).

In this case, Father committed severe child abuse, in that he knowingly exposed his children to, or knowingly failed to protect his children from, abuse or neglect that was likely to cause serious bodily injury and/or death and that the knowing use of force on his children was likely to cause serious bodily injury. *See* Tenn. Code Ann. § 37-1-102(b)(22). The severe abuse Father committed against Arianna resulted in her death. Father was tried and convicted of aggravated child abuse and felony murder and is serving a life sentence for his actions. By definition, that conviction establishes severe child abuse that serves as the basis for termination of parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4). There is no dispute that Arianna was a sibling to the children who are the subject of this parental termination action. Evidence showed that all of the children resided together with Mother and Father. Severe child abuse committed against one sibling results in severe child abuse against the other siblings. *See* Tenn. Code Ann. § 36-1-113(g)(4). Thus, Father's parental rights were properly terminated on the grounds of severe abuse.

As for Mother, she argues on appeal that the evidence of record is insufficient, as a matter of law, to uphold the trial court's order terminating her parental rights on the basis of severe child abuse. First, Mother contends that the trial court erred by not allowing Mother's testimony explaining her absence from the home on the day Arianna died. Mother's reasoning is that because she was not physically present when Father caused the death of their child, that Mother did not commit severe child abuse. Mother argues that

the trial court's denial of the opportunity to explain the circumstances surrounding Arianna's death constitutes material error and the trial court's order terminating Mother's parental rights should therefore be reversed. We disagree.

As our court has previously said, "[Mother's] argument that the statute applies only to one who "commits" the abuse is untenable. Allowing a child to be abused is egregious abuse." *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 176 (Tenn. 1996). Mother's reasoning that because she was not home on the day Father abused their child to the point of death means that Mother did not commit severe abuse herself ignores key language in the statute that explains what constitutes severe child abuse. As stated above, part of the definition of "severe child abuse" is "[t]he knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(22)(A)(i).

The trial court was not persuaded by Mother's argument, and neither are we. In its order dated August 15, 2016, the trial court reminded Mother and Father that the parents were on notice that somebody had abused their children. Pursuant to the original dependency and neglect case from 2009 that removed the children from Mother and Father's care and placed them in the custody of DCS, the juvenile judge found that severe abuse had occurred at that time. Although the court did not directly attribute the finding of abuse to either parent or any one specific person, the court determined that the parents were on notice that somebody had severely abused their children. The trial court went on to say:

> The Court would find that the mother testified that [Father] had abused her prior to Arianna's death and as long as four years prior to their divorce. The Court would note that [Mother and Father's] divorce did not occur until after the death of Arianna [T.]. The Court would find that a reasonable person should be able to connect the dots. That if [Father] is going to continuously abuse his wife, there is a great possibility that he is also abusing his children. The Court would further find that a reasonable person under the same circumstance could reach the conclusion, that [Father] was also the person that had abused the child in the previous DCS matter.

In short, Mother committed severe abuse by failing to protect Arianna from Father's known abuse.

Second, Mother asserts that her criminal convictions stemming from Arianna's death cannot establish severe child abuse for purposes of terminating her parental rights. To be convicted of "severe child abuse," under Tenn. Code Ann. § 37-1-102(b)(22), a person must have acted knowingly; Mother, however, was convicted of criminally negligent homicide. A conviction for criminally negligent homicide requires that the person have acted with criminal negligence. "In other words, the accused must know, or

should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." *State v. Adams*, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995); Tenn. Code Ann. §§ 39-11-106(a)(4), 39-11-302(d), 39-13-212(a). Mother contends that the result of inferring severe child abuse based on a criminal negligence conviction yields a lower standard to convict her. Mother argues the two statutes are not of equal weight for purposes of terminating her parental rights. We find Mother's argument unpersuasive.

Mother's contention that a lower standard was used to imply severe child abuse against her ignores an important, additional finding by the trial court: that Mother committed severe abuse because she knew or *should have known* that Father abused the children in a way that could cause serious bodily injury or death. *See* Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added). The trial court pointed out that both parents were on notice that somebody was abusing their children. Evidence was presented that Father had physically abused Mother, and that no other adults lived with parents and the children. The trial court found that Father severely abused his child to the point of death and that Mother also committed severe child abuse of her children by failing to protect them from Father's abuse. Therefore, the evidence clearly and convincingly establishes grounds for terminating Mother's parental rights based on Tenn. Code Ann. § 36-1-113(g)(4).

### B. Being Sentenced to More Than Two Years' Imprisonment

In Tennessee, the court may terminate parental rights upon finding clear and convincing evidence that:

> [t]he parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian;

Tenn. Code Ann. § 36-1-113(g)(5).

At the conclusion of proof, DCS made an oral motion, pursuant to Tenn. R. Civ. P. 15.02, to allow the pleadings to conform to the proof submitted at trial. DCS made this motion in order to petition the court for an additional ground for termination of the

parents' parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(5) based on the evidence of Mother's and Father's criminal convictions submitted at trial.

At the time of trial, Father was already serving a life sentence for his convictions of felony murder, aggravated child abuse, and false report surrounding the death of his daughter, Arianna. Undisputed evidence showed that Arianna was the sibling of the children who are the subject of this parental termination case, and that all three children resided with Mother and Father. As a result, the trial court found clear and convincing evidence that, based on these convictions and a sentence of more than two years' imprisonment, Father's parental rights should be terminated under Tenn. Code Ann. § 36-1-113(g)(5). We affirm.

As for Mother, she was also convicted of criminal charges stemming from Arianna's death. Mother was sentenced to serve two years for criminally negligent homicide, three years for the false report conviction, and 11 months 29 days for the reckless endangerment conviction, which altogether resulted in a five year prison sentence. However, the trial court found that the language was not clear in Tenn. Code Ann. § 36-1-113 (g)(5) as to whether a parent may be sentenced to two years exactly or if a parent has to be sentenced to more than two years in order for Tenn. Code Ann. § 36-1-113 (g)(5) to apply as grounds for parental termination. The language in the first sentence of the statute applies to a parent sentenced to more than two years' imprisonment for conduct against the child, while the language found in the last sentence of the statute maintains that "unless otherwise stated," the parent must be imposed a sentence of two or more years. The language is somewhat murky. We believe the phrase "unless otherwise stated," supports the trial court's decision that there are not grounds to terminate Mother's parental rights based on Tenn. Code Ann. § 36-1-113 (g)(5) alone. However, we need only find one applicable ground to terminate Mother's parental rights, which we have already affirmed as discussed above regarding the severe abuse. As such, we reiterate that Mother's parental rights were properly and legally terminated.

## II. BEST INTERESTS

To terminate parental rights, a court must determine not only that the evidence provides clear and convincing proof that grounds for termination exist, but also that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)–(2). If one of the statutory grounds for termination is proven by clear and convincing evidence, a parent's rights may be terminated if termination is in the best interests of the child. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

The legislature has identified nine statutory factors for the court to consider in conducting a best-interests analysis, *see* Tenn. Code Ann. § 36-1-113(i); however, this list is not exhaustive, and the court need not find the existence of every factor before it may conclude that terminating an individual's parental rights is in the best interests of a

child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Further, in considering a petition to terminate parental rights, the court is called to make a determination of the child's best interests from the perspective of the child rather than the parent. *In re Heaven L.F.*, 311 S.W.3d at 441.

The parents have not made an adjustment of circumstance, conduct, or conditions that would make it safe and in the children's best interests to be in the home of Mother or Father. *See* Tenn. Code Ann. § 36-1-113(i)(1). DCS initially took custody of the children in 2009 based on suspected abuse, and after the children were returned to Mother and Father's care, the abuse continued to the point where it resulted in the death of the children's sibling. Additionally, neither Mother nor Father has been released from incarceration, meaning that neither is able to establish a home to which the children may return, let alone a safe home that is in the children's best interests.

Second, Mother and Father have not visited the children for nearly four years, and they have not established a meaningful relationship with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3)–(4). No-contact orders were entered against both Mother and Father, and neither has seen the children since Arianna's funeral in June 2013. The children have disclosed that they fear Mother and Father, even to the point of being scared to return to their old neighborhood. When they came into DCS custody, the children were afraid to go out in public for fear of seeing Mother and Father. Thus, these factors weigh in favor of termination of Mother's and Father's rights.

Third, Mother and Father have shown brutality, physical, emotional, and psychological abuse against the children and against Arianna. *See* Tenn. Code Ann. § 36-1-113(i)(6). Mother's and Father's criminal convictions and the trial court's finding of severe abuse by both Mother and Father cause this factor to weigh heavily in favor of termination.

Fourth, a change of caretakers and physical environment would likely have a negative effect on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). The children have resided with the same foster family for three and a half years. During that time, they have bonded with the foster family and refer to the foster parents as "mom" and "dad." The foster parents intend to adopt the children if parental rights are terminated. Thus, this factor weighs in favor of termination of Mother's and Father's parental rights.

Finally, to the extent that it is not considered in the listed statutory factors, the severity of the abuse in this matter demonstrates that termination of parental rights is in the children's best interests. The children have spent a total of nearly seven years — the majority of their lives — in DCS custody because of multiple instances of bruises, broken bones, and other signs of abuse against each of them. Mother and Father were given a

second chance to care and provide for the children, and it resulted in the death of the children's sibling. The children have been severely scarred emotionally and psychologically, from which it has taken them years to recover. They were afraid to go out in public because they might see Mother or Father. They were afraid to drive in their old neighborhood. They identify Mother and Father as the killers of their sister, and they have no desire to be reunited with them. Father is sentenced to remain in prison for the rest of his life, and Mother is set to serve a total of five years. There is no likelihood that the children can be returned to their custody any time soon, and even if they could, the inherent risk of further abuse or neglect persists. Therefore, we affirm the trial court's ruling that termination of Mother's and Father's parental rights is in the children's best interests.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Rawny A..

_____
FRANK G. CLEMENT JR., P.J., M.S.